See also, D.C., 489 F.Supp. 354.

HUGHES TOOL COMPANY (Now Summa Corporation), Plaintiff,

v.

John H. MEIER, Defendant.

No. C 71–72.

United States District Court, D. Utah, C. D.

October 11, 1977.

---

Edward W. Clyde, Salt Lake City, Utah, and James L. Wadsworth, Las Vegas, Nev., for plaintiff.

Robert Wyshak and Lillian Wyshak, Los Angeles, Cal., for defendant.

### ORDER DISMISSING CLAIM OF FRAUD

ALDON J. ANDERSON, District Judge.

#### PREFACE TO ORDER

Near the conclusion of the trial of the case in chief in the above matter, the remaining defendant, John H. Meier, through his counsel, Mr. Wyshak, filed a motion with the court asking for a continuance of the trial and an amendment of the pretrial order. The continuance was sought to allow time to check into evidence of the claimed forgery of certain affidavits of Howard R. Hughes, filed in the action, which had recently come to his attention. The amendment of the pretrial order was asked to enable the defendant Meier to further discover facts to present issues which the claim of fraud would permit him to raise.

The affidavits referred to were purportedly signed by Mr. Hughes and filed in the case in chief to assure the court that he would personally be present for his deposition and examination by the attorneys for the defendants, in the order of priorities set by the court for depositions of the parties. The first affidavit shows the purported signature of Howard Hughes, notarized by telephone, according to the jurat of the notary. The second affidavit represents that it was signed by Howard Hughes personally before the same notary. This was done because of the objection of defendant to the telephonic notarization of the first affidavit and the court's order requiring it. (These exhibits are hereafter referred to as Exhibits 153 and 151, respectively.)

Mr. Wyshak filed an affidavit in support of his motion to the effect that he had expert testimony that might show said affidavits, Exhibits 153 and 151, were forgeries.

With his motion and affidavit was a purported copy (Exhibit 152) of the second page of the affidavit designated Exhibit 151, but with a signature of Howard R. Hughes different in appearance than that on Exhibits 153 and 151. Across the same page there was written at an angle the words, "No good—cannot use. Levar." Levar Mylar was the notary on the affidavits marked Exhibits 153 and 151. In his motion, Mr. Wyshak made demand that plaintiff produce Levar Mylar for examination without delay in conjunction with his motion. His purpose was to have a chance to establish the forgery of Exhibits 153 and 151, and upon that premise he asked the court for the relief noted above.

Mr. Wyshak also filed with his motion a document identified as Exhibit Defendant's UU, in substance purporting to be signed by Howard R. Hughes and, among other things, stating "drop the pressure on Meier" and that he was entitled to the money he had received. It was dated June 21, 1974.

The court also affirmed an order previously entered denying a motion to amend the pretrial order to permit the claim that Howard Hughes had approved Meier's getting any money he received. This document (Exhibit UU) was allegedly from records of Mr. Hughes held by Mexican authorities, copies of which had been released to Ms. Trevillion, and later delivered to Meier.

The plaintiff produced Levar Mylar immediately thereafter and he was sworn and examined at length by counsel for the parties with respect to the signing of Exhibits 153 and 151 by Howard Hughes and his notarization of said documents. Mr. Mylar categorically affirmed he had personally sworn Mr. Hughes and witnessed the signing by him of Exhibit 151 and then notarized it. Further, he testified that he was familiar with the signature of Mr. Hughes over his years of service with him and that in his opinion Mr. Hughes had signed at the place calling for his signature on Exhibit 153. He gave the detail of the phone notarization and affirmed he had signed it.

The court denied Mr. Wyshak's motions and the case in chief proceeded to its conclusion. The presentation of evidence was closed and each side rested.

After the conclusion of the case the court met with counsel and proposed that some effort be made to inquire further into the question of fraud attempted upon the court, either through the documents presented in support of Mr. Wyshak's motion or the affidavits of Mr. Hughes notarized by Levar Mylar. Counsel agreed that it should be done. Dates were set for completing discovery, for a pretrial session, and a hearing. All matters were finally concluded and the hearing began on January 5, 1977. Witnesses were sworn and examined for both sides, extensive exhibits received, and final argument heard. The matter was to be concluded and a ruling made before the decision in the case in chief, if at all possible. If a determination of the court in this inquiry would necessarily affect any issue in the case in chief, there would be an opportunity to make such appropriate changes in the court's order and the proceedings in the case in chief, as may be required.

The court is fully advised and is prepared to enter its ruling.

### ISSUES FOR RESOLUTION

1. Whether or not the defendant Meier has established by clear and convincing evidence that Exhibits 153 and 151 are forgeries and thus a fraud on the court.

2. Whether or not in the submission of Exhibits A and B attached to Mr. Wyshak's motion, clear and convincing evidence establishes a fraud on the court has been attempted.

3. If a fraud is established in either of the foregoing instances, what action should the court enter affecting the case in chief and the parties responsible.

### STATEMENT OF FACTS AND DISCUSSION

The basis of Meier's claim that Exhibits 153 and 151 are forgeries is the testimony

of Mr. William L. Bowman, a handwriting expert of impressive qualifications. Mr. Bowman began with the Los Angeles Police Department, where he was trained under Mr. John L. Harris. He has performed examinations for 48 to 50 of the police departments in the County of Los Angeles and has testified in court more than 800 times.

At conclusion of Mr. Wyshak's examination of Mr. Bowman, he gave his expert opinion that Exhibits 153 and 151 were not written by the man who signed "Howard" and wrote the documents in evidence as Exhibits A through G of the Maheu deposition (hereafter the Maheu exemplars, purportedly Howard Hughes).

Mr. Bowman's examination focused upon only the word "Howard" in the exemplars, since nowhere therein was there a full signature of "Howard R. Hughes." In his examination he made comparison between the form of the writing of the letters in the signature "Howard" and the same letters in the cursive text materials of the memos in the Maheu exemplars, as compared with the same letters and "Howard" in the signatures on Exhibits 153 and 151 and the signatures on plaintiff's proffered exemplars, Exhibits 1 and 2. Exhibit 1 is a document purportedly containing written answers to questions with the signature of Howard R. Hughes in the Clifford Irving matter. At the bottom are what were testified to as the fingerprints of Howard R. Hughes. Exhibit 2 is the signature of Howard R. Hughes appended to "Answers to First Set of Interrogatories" filed on July 10, 1974, in the Superior Court of the State of California, for the City and County of San Francisco, in the case of *United States Trust Company of New York, et al. v. Summa Corporation*, No. 643–644. It was notarized by Richard M. Anderson, July 5, 1974.

Mr. Bowman began his significant testimony by testifying he could not "make a positive opinion" (p. 12 Tr.) as to any similarity in typing of Exhibits 153 and 151 on the one hand and 152. He noted the poor xerox quality of Exhibit 152 (C–331), a problem causing difficulty in other comparisons. And yet he further said he found no basic difference to believe they were made by different typewriters.

The testimony next centered upon characteristics in the writing of the Maheu exemplars, to determine how that writer wrote to enable a more precise comparison with Exhibits 153 and 151. He started with the letter H in the lower right-hand corner of Exhibit M(A), then to Exhibit N(B), Exhibit F on the third page, and to Exhibit E on the fourth page. In deposition Exhibit C he noted the name Howard. From these exhibits he picked out characteristics he felt would support his view that "Howard" in the exemplars was written by one person and someone else signed Exhibits 153 and 151.

On the capital H he said that in the exemplars he found certain consistencies. There was a hook at the top of the right column, and sometimes with a drag line. Also, the crossbar of the H was done in a triangular movement which tended to be of small size. The H joins the o, as Ho. Next, the o, a and d were similar in that a line of 45% angle could be drawn from upper right to lower left. The open position of the w and the tendency for a lower position of the second part of the w were consistencies. One then observes the continuous stroke of the w to the a. There is a tendency to lift the pen before writing the "d." He considered significant the straight ending of the d and the oval shape.

In relating these consistencies to "Howard" in Exhibit 151 he observed that the H in Exhibit 151 did not contain the hook and the size of the triangle is larger in relation to the H and the shape is different. He described what he felt was evidence of heavy pen pressure on Exhibit 151. In making the triangle and the H generally, there was the tendency to drop ink, but this was not the characteristic of the writer of the exemplars. He felt the o, a, and d did not have the same angular similarity in Exhibit 151 as in the exemplars. Also, the stroke on the w goes upward and does not touch the letter a. He did concede that Exhibit C had instances where the line be-

tween w and a on some exemplars did join. He noted that there was a pen lift between the r and d which was not the writing characteristic of the person who wrote the exemplars.

On cross-examination, the court observed matters of interest, among many that were covered. It is better to compare signatures with signatures than with text materials as Mr. Bowman said he had done; and that the use of full name exemplars would be a lot better than the text materials of the exemplars he used, with no comparison using the last part of the name Howard R. Hughes. Also, it is basically important to recognize that text material is more evenly flowing. A person puts more into the signing of his signature.

He agreed that a signature on a court document (Exhibit 2–3) would tend to be more formal than the somewhat casual writing of the Maheu exemplars, but in Mr. Hughes' case, where he signed so many, he was not sure this would make any difference. He did consider Exhibit 151 to be a formal type signature. He explained that he had asked for other documents where Howard R. Hughes had written his full signature, but none of the documents had been produced for him. The witness said that tremor or waiver and lifts (p. 20) were indications of possible forgery; that the writing of the H in Exhibit 151 had such an indication. When shown photographic enlargements of Exhibit 151 he identified some tremor in the H in Hughes.

Mr. Bowman gave his further opinion that the signature of Howard R. Hughes on Exhibit 152 was made by someone other than one making the signature on the Maheu exemplars. It appeared to him "somebody else possibly attempting to simulate that kind of writing." He also thought the signature of Levar was forged. (Tr. p. 36 of cross-examination.) This opinion of forgery was shared in by Mr. Shaneyfelt, the Summa expert. It was supported by Mr. Mylar's testimony his name was forged and that he wrote none of the other writing on it. Mr. Bowman examined Exhibits 153 and 151, and the notarization by Levar My-

lar in each instance, and the exemplar signatures Mylar made in court, Exhibit VV, and gave his opinion that they were by the same person. This further corroborated Mylar's testimony. With the determination that Exhibit 152 was undeniably a forgery, Mr. Wyshak's motion, with this exhibit appended as Exhibit A, was substantially undercut.

The source of Exhibit 152 was represented as being at best a copy of a copy in the hands of Mexican authorities derived from the original records of Mr. Hughes. But it would have no reason for existence as a double forgery in the Hughes records. On the other hand, Mr. Meier or his counsel, Mr. Wyshak, have given the court no reason why the same should be relied upon for any purpose.

The testimony then developed the fact that except for the signatures and writing Exhibit 152 was a second or third generation copy of C 337 (a number placed on a document, allegedly by Ms. Trevillion, in making a copy of the copies the Mexican authorities had of the original Hughes records). He said it was possible that the original signature on C 331 or Exhibit 152 could have been placed on a xerox copy rather than the original. He also thought Exhibit 152 was made from 331. (Tr. pp. 41, 44, 45 of cross-examination of Bowman.)

The examination then focused on the signature characteristics shown in Exhibit 6. This was a photo enlargement of Exhibits 153, 151, 1 (with two signatures), and 2. He conceded he did not spend much time looking at Exhibit 153, where the loop was on the right-hand side like his exemplar (Maheu), and that there were similarities between the exhibits on 6 and B, C, and F of the Maheu exemplars in the writing of the H in the presence or absence of the hook. (Tr. pp. 51–57 of cross-examination of Bowman.)

After being queried about the H in great detail, the witness said that in his exemplars there were at least four different ways in which the H was made. (Tr. p. 58 of cross-examination.) The witness noted the w in Howard was lower in the second loop

and that this was true in all the exhibits. He testified that there was a break between the w and the a in the questioned signatures and on some of the exemplars. He observed that such appeared in both signatures on Exhibit 1 and also in 2. (Tr. p. 60 of cross-examination.) On the other hand, it was absent in Exhibit 153. On the writing of Howard in the exemplars he examined there was no break. As to the o in Howard in Exhibits 153, 151, 1 and 2, Bowman found a "conglomeration of Os." (Tr. p. 64 of cross-examination.)

On the d in Howard he found loops in the upper stem on Exhibits 153, 151, 2 and on one of the signatures on Exhibit 1, and acknowledged that there were numerous such occasions in the text material of the exemplars. (Tr. p. 65 of cross-examination.)

While Bowman stated his opinion basically involved the writing of the word Howard, he did examine the making of the letters in the text that are represented in the name Hughes. We said that the letter g in the text was never made like it appears in the name Hughes. He noted some similarity in this respect between Exhibits 151 and 2, but not as much as to the others.

The witness acknowledged that the experts say that in cases of forged signatures, not only should comparison be obtained from documents of similar importance, but if possible also from documents which are roughly contemporary with those in question. (Tr. p. 72 of cross-examination.)

On redirect examination Mr. Wyshak drew from him the opinion based on his examination of the handwriting and signatures on Exhibit 1 and the Maheu exemplars that he found a great deal of consistent differences and his opinion was that someone other than the writer of the Maheu exemplars wrote Exhibit 1. (Tr. p. 76 of redirect examination.) He stated that the signature on Exhibit 2 was substantially similar to Exhibit 1 and probably written by the same person. (Tr. p. 77 of redirect examination.)

Among the differences first above referred to he said that the I in capital form was different in the Maheu exemplars than in Exhibits 153, 151, 1 and 2. Also, that the lack of a loop in the y in Maheu exemplars and the presence of one in Exhibit 1 was significant. (Tr. p. 83 of redirect examination.) The g formation was similar. (Tr. p. 86 of redirect examination.)

He considered a major difference was that the t in the Maheu exemplars had a t crossing with a continuous line when it was the last letter of the word. By contrast he said this was not true of the t in Exhibit 1. (Tr. p. 88 of redirect examination.)

In addition he observed the shape of the capital N, which appears numerous times in Exhibit 1 and the Maheu exemplars (Exhibits A–G). He thought it significant the starting stroke of N and M were high. Whereas in Exhibit 1 the N is more angular and the top starting point is lower and the second part higher. He felt this was not the characteristic of the writer of A–G.

He said he counted the pen lifts with a view to determining whether there was a comparable number of pen lifts compared with his exemplars and found far more in Exhibit 1. (Tr. p. 95 of redirect examination.)

The witness concluded his response on redirect by giving his opinion Exhibit 153, 151 and 2 signatures were all by the same person; that the two signatures in Exhibit 1 were written by the same person, and could be the same person as wrote in Exhibits 153, 151 and 2, but with some time lapse to explain the differences. (Tr. pp. 103, 104.) When queried on time, he said the Maheu exemplars were in 1968 and Exhibit 1 in 1972, Exhibits 153 and 151 in August and December, 1973. (Exhibit 2 was in 1974.)

The foregoing represents what appeared to the court to be of significance in the testimony of the defendant's expert, Mr. Bowman. Important for defendant's position was the opinion that the affidavits, Exhibits 153 and 151, were not executed by the writer of the Maheu exemplars (Exhibits A–G) identified as Howard R. Hughes by Mr. Maheu in his deposition. His testimony was the substantial evidence offered by defendant on the issues above framed.

To enable a clearer comparison of the important evidence on these issues offered by plaintiff, the court will review the testimony of Mr. Lyndal T. Shaneyfelt, and highlight those portions which impressed the court as having impact on the matters Mr. Bowman discussed. From these observations the court will draw those inferences which seem most persuasive. With such help as the testimony of other witnesses may provide, the court will then determine its ruling on the issues.

Mr. Shaneyfelt was a former FBI agent with a special assignment in questioned documents for many years. His training has included work in comparison of typewritten materials, paper used in typing, duplicating machines, and the quality and characteristics of paper used in such machines. He is skilled in the examination of paper under ultraviolet light to determine the peculiarities of particular documents as compared with others as demonstrated by their reaction to ultraviolet light. He has testified in various courts over the many years of his service, having examined thousands and thousands of documents.

Mr. Shaneyfelt prefaced his opinions by emphasizing the importance of looking for letter forms and deviations therefrom, the need to compare signatures with signatures and to remember that most persons execute their signatures with more style and flourish than are found in text writing.

Mr. Shaneyfelt testified that he carefully examined Exhibits 1 and 2 as represented exemplars of Howard R. Hughes. He made comparisons of them with Exhibits 153 and 151, the challenged documents. He had also made comparisons with the Maheu exemplars and with Exhibits 152 and UU, Mr. Mylar's (Exhibit VV) signature and writing done in court. He made a photographic enlargement of Exhibits 153, 151, 1 and 2 to assist the court in better understanding his testimony. These photos were put together in a chart received in evidence as Exhibit 6. He gave as his professional opinion that the person signing Exhibits 1 and 2 were the same person, and that this person had also signed the challenged affidavits, Exhibits

153 and 151. (Tr. p. 124–6, direct examination.)

As observed earlier, and in agreement with Mr. Bowman, Mr. Shaneyfelt found that the person signing Exhibits C 331 and 152 as Howard R. Hughes had not signed the other exhibits, or, for that matter, the Maheu exemplars. He further concluded that the signature of Mr. Mylar on Exhibit 152 was not by the person writing and signing his name in court, Exhibit VV, and that the latter person notarized by signing Exhibits 153 and 151. Thus, as earlier observed, the experts agree that Exhibits 152 and C 331 are forgeries.

Of great importance to the case was his conclusion that the signatures and writing on Exhibits 153, 151, 1 and 2 were consistent with the same person who wrote the Maheu exemplars. (Tr. p. 141 of direct examination.) He acknowledged there were variations in the writings, but stated:

. . . I believe strongly are due to differences also attributable to text writings as opposed to signature writings, where the signature is an important—an important document; differences are also due to advancing age or changes in writing habit over a longer period of time.

I felt that all writings were well within the sphere of one individual, considering those factors of advanced age over a period of time, and then cursory versus signature considerations.

I had no problem with them. I found nothing that would suggest to me that any part of them were forged; and in addition to signatures on the affidavits and the exemplar writings that were witnessed by Mr. Mylar and Mr. Anderson are totally in my view, totally devoid of evidence of forgery. (Tr. p. 142.)

The conclusions Mr. Shaneyfelt reached were supported by examination of the writing and signature characteristics in the documents hereinabove referred to.

On the H in Howard he testified Exhibits 153, 151, 1 and 2, reflected for easy comparison on Exhibit 6, were similar and consistent in substantial respects. They were also similar to Exhibits M and N (A and B of

Maheu deposition exemplars). The differences he thought were explainable over time. Exhibits M and N are of 1968 vintage and the others over 1972–1974. (Tr. p. 224 of direct examination.) He gave as his further opinion that he saw nothing in the exemplar signatures he used (Exhibits 1 [two signatures] and 2) to indicate a forgery. There was good line quality, good writing speed. The letter forms were well made, except for the g in Hughes in Exhibit 1, where there had been a retrace over the g, which is a characteristic of the writing on Exhibit 1, and also in the Maheu deposition—a habit in some instances of going back and retracing (Tr. p. 23 of direct examination).

On the o of Howard he noted in Exhibits 153 and 151 it is rather round, tending to be fatter at the bottom, making a somewhat triangular form. At the top the lines tend to come together like the tying of a knot, as in Exhibit 10, or quite loose as in Exhibit 2—almost like a figure 8. By comparison he said Exhibit N has the same configuration in the word "above" in the third paragraph. (Tr. pp. 228, 9 of direct examination.)

The stroke from the o to the w in Howard he found to be relatively straight in the signature on the affidavits (Exhibits 153 and 151) and on his exemplars (Exhibits 1 and 2). And the court notes this characteristic in the words "now" and "how" in Exhibit N.

In the stroke going from the w to the a he described a concluding upstroke on the w, without connecting with the a, which he observed as present in Exhibits 1 and 2. However, the word "know" on the second page of Exhibit 1 shows the characteristic upstroke at the end of the w. But in Exhibit 153 the stroke goes straight from the w connecting with the a. In Exhibit 151 it does the same without quite connecting. The court observed that a similar characteristic, both connecting and not connecting, could be found in Exhibits M and N. For example, in Exhibit M, in the marginal note, the upstroke of the w, without connecting to the next word, is seen in the word "however." And in Exhibit N, the words "willing" and "otherwise" in the first paragraph, and the word "follows" in the second paragraph, and the word "with" in the first page of the last paragraph, show the failure to connect and the upstroke of the w. In those exhibits there are more frequent situations where the w connects with the next letter. However, in every instance where w appears at the end of a word in Exhibits M and N it ends in the characteristic upstroke. The signatures of Howard in Exhibits M and N show a connecting stroke from the w to the a. Having in mind such variation, there seems to be little support to a claim of forgery of Exhibits 153 and 151 because of this characteristic.

Mr. Shaneyfelt thought the formation of the a in Howard in the affidavit signatures (Exhibits 153 and 151) and exemplars (Exhibits 1 and 2) were consistent and well within the writing ability of one person. And in all signatures on Exhibit 6 there is a connecting stroke between the a and the r. (Tr. p. 237 of direct examination.) He said there was usually a connecting stroke from the a to the r, but that there were five variations of r. He also found similar variation in Exhibits M and N. To the court the variations were similar and provided a consistency with Exhibits M and N. Mr. Shaneyfelt said there was a connecting stroke between the r and the d in Exhibits 153 and 151 that were comparable. He observed that proportion, size and shape made the d in Exhibit 151 and page 2 of Exhibit 1 totally consistent.

Mr. Shaneyfelt's testimony proceeded to cover the R. and Hughes of the questioned signature, whereas Mr. Bowman's stopped at this point. With respect to the R., he stated that in all of the signatures on Exhibits 153, 151, 1 and 2 it was a large, flourishing letter form, and while there were differences the pressure patterns were the same and because of the consistency of the pressure—varying from light to heavy in the same places—these subtle characteristics would make forgery very difficult. (Tr. p. 243 of direct examination.)

An interesting point was that after the R. the writer put a period that was a "scribbled type of period" rather than a dot. This was true in all of the exemplar signatures and the affidavit signatures as shown by Exhibit 6. Significantly, these were also found in Exhibit N. (Tr. p. 243 of direct examination.) It is a characteristic that a forger would not likely pick up.

Mr. Shaneyfelt found the u consistent in all five signatures and the g substantially the same. There was some variation in the h, but they do not represent the influence of another writer. (Tr. p. 247 of direct examination.)

The e on the affidavit signatures is made with a little pointed angle on the upper right of the rather flat top. It is the same on page 2 of Exhibit 1. (Tr. p. 247 of direct examination.)

The s on Exhibit 153 is pointed at the top, but the basic form and shape are consistent in the exhibits referred to.

By way of conclusion Mr. Shaneyfelt said:

> I found the writings on the affidavits and the exemplars 1 and 2 and the Maheu deposition writings consistent with the writings of one person. (Tr. p. 248 of direct examination.)

He further said that the handwriting in the answers to the twelve questions on Exhibit 1 in letter forms and in handwriting characteristics are consistent with the Maheu writings. He acknowledged variations in appearance but attributed these to the age difference, 1968 versus 1972. It was his opinion they were from the same writer.

The differences to the untrained eye, in the court's view, give the impression of a smoother, more flowing style in the 1968 writings as compared with the 1972 ones, which seemed more angular and jerky, or less smooth. Age and declining health, and the comfort of the signing posture, could account for many differences.

Added to this is the set of fingerprints placed on Exhibit 1, and not controverted as Mr. Hughes'. Levar Mylar testified that Exhibit 152 (C–331) was not his writing, and that the signature of the notary on Exhibits 153 and 151 was his. This has been confirmed by both experts. Mr. Mylar now asserts he also witnessed Mr. Hughes' signature on Exhibit 1.

Mr. Shaneyfelt told of his examination of the Maheu writings to see whether there were differences in the writing of the letter 'y. He noted the loop and upstroke on the tail in Exhibit 1. It is observed that in Exhibit E most of the y's have a straight line tail, without a loop, and yet that impulse to put a loop is there, as in the word "community" in paragraph 5, where the writer reformed the downstroke to add the upstroke.

He commented on the variation in characteristics evidenced in Exhibit 1 as being contributed to in part by the spacing of the typed materials which required squeezing in between lines. Writing position and frame of mind could make the writing more angular.

Next came his testimony opining that the signature of Howard R. Hughes on Exhibits C 331 and 152 was not written by the writer of Exhibits 153, 151, 1 and 2. He felt there was nothing at all to suggest that the latter group were forgeries. The quality was good and consistent with the exemplars. He further thought that there was consistency between Exhibits 1 and M and N. He also thought that they were consistent with Exhibits 153 and 151. He hesitated when asked if the text in Exhibit 1 was consistent with Exhibits M and N, but then concluded it was all written by the same person. His hesitancy expresses the doubts these variations raise in the lay mind, without the subtle help of the expert to resolve some of them.

Mr. Shaneyfelt on cross-examination said he had used Exhibit 3, rather than 2, for examination and comparison and that the signature on Exhibit 6 designated as Exhibit 2 is actually from Exhibit 3. So where Exhibit 2 has been mentioned in this regard in this opinion Exhibit 3 should be had in mind. They are both identical with the document filed in the California court, of which they are copies. Exhibit 4, some-

times referred to, is a photograph of this original signature on Exhibit 3. (Tr. p. 24 of cross-examination.)

Mr. Shaneyfelt thought there was little difference in the writing ability evidenced in Exhibit 3 and in Exhibit 1A, (1) although two and one-half years elapsed between them. Exhibit 1 is January, 1972, and Exhibit 3 is July 5, 1974. (Tr. p. 24 of cross-examination.) Mr. Shaneyfelt acknowledged that he was not aware of Howard R. Hughes' health or physical condition. He had read Mr. Hughes broke his hip in 1973 and was bedridden for a lengthy time, and this before signing the affidavits Exhibits 153 and 151. (Tr. p. 27 of cross-examination.)

Also, from the cross-examination it appeared that in connection with the so-called Mormon will he examined that document and the Dear Chester and Bill letter, the original of Exhibit 1 and copies of Exhibits F and A–7, among other materials, in connection with a request to determine the validity of the signature of Howard R. Hughes under various circumstances. Hence, his testimony has to be accorded additional weight from the standpoint of the number of items he has been called upon to examine. (Tr. p. 42, 3 of cross-examination.)

He further said that if his examination of the signatures on Exhibits 153 and 151 were limited to a comparison with the text writing of Exhibit G, for example, (Maheu exemplars) without full signatures, that his identification given in this case, while it would lean toward identification, would be less positive. (Tr. p. 54 of cross-examination.)

He testified he had Exhibit Q which was the Designation of Counsel in *United States v. Hughes*, LV–2843, purportedly signed by Mr. Hughes and Exhibit P, the letter of transmittal of that document to the clerk of court, also signed in similar fashion. However, he did not use them as part of his final opinion. This was based on Exhibits 153, 151, and 1 and the original of Exhibit 2, as stated previously. (Tr. p. 67 of cross-examination.) He stated, however, that it was his opinion that Exhibits P and Q were executed by the same person who executed Exhibits 153, 151, 1 and 2, and most probably the person who wrote the deposition exhibits.

With respect to circumstances that might affect the quality of the writing he testified he was told that when Exhibits 1 and 2 were signed that Mr. Hughes was in an elevated bed, sitting in a vertical position, with a clipboard on his lap, with possibly pads of yellow paper on it, and the document was laid on that, and he signed it. He was not sure whether he was in bed in one or in a chair on the other, or in bed in both instances when he wrote on Exhibits 1 and 2. (Tr. pp. 75, 6 of cross-examination.)

Mr. Wyshak questioned Mr. Shaneyfelt on the differences or dissimilarities he found between Exhibit 1 and the Maheu exemplars. He answered that he found no dissimilarities not consistent with the handwriting of one person over an extended period of time. (Tr. p. 120 of cross-examination.) He further observed on query about the formation of the y, with or without an upstroke, that if it were shown that the writer made only one different rendition of the y with an upstroke on the deposition exhibits that compared with others, and 300 without an upstroke, it means that some of the time he writes a y with an upstroke. (Tr. pp. 120, 1 of cross-examination.) He counted 33 y's that end in a downstroke in Exhibit B and two that had the upstroke. (Tr. p. 124 of cross-examination.)

He gave as his opinion that the words, "Please handle" on Exhibit 825 were probably not written by the writer of the deposition writings or any of the other exemplar writings. (Tr. p. 126 of cross-examination.) He could not be positive he said because of the poor xerox copy and the lack of sufficiently strong characteristics, although he acknowledged the word "Please" underlined appears many times in the deposition exemplars. He found many pen lifts as a difference and in it poor quality. These were his observations on the text.

As to the signature on Exhibit 825 he found the word "Howard" very similar to the "Howard" portion of C 331–152, the "Do not use, Levar Mylar" exhibit. It was his opinion the portion of the signature, "Howard R." on Exhibit C 331 was not written by the writer of the exemplars. He said, "I feel that because the similarity of the "o-w-a-r-d portion on 825 and C 333 (*id.* 331) I became suspicious of that signature." (Tr. pp. 128, 129 of cross-examination.) And again, "And because I had already determined that the signature on 331 is a forgery and not written by the writer of the exemplars, Exhibit 1, Exhibit 2, the deposition exhibits, since that signature on C 331 is a forgery, and the o-w-a-r-d of the signature on 828(5) bears a striking similarity to the o-w-a-r-d of Exhibit C 331." (Tr. p. 130 of cross-examination.) Then he went on to say in effect that he leaned toward the possibility that the signature Howard R. Hughes on Exhibit 825 may have been written by someone other than the writer of the exemplars on Exhibit 1, Exhibit 2, and the deposition exhibits. (Tr. pp. 130, 131 of cross-examination of Shaneyfelt.) A motion to strike the conclusion of forgery was granted, but the factual information and his examination of certain documents remains as a basis for the conclusion he reaches.

In the direct and cross-examination of Mr. Shaneyfelt he was examined about the copying machine characteristics found on the various copies, and the light reaction produced by an examination of the documents with which we are concerned under ultraviolet light. Mr. Wyshak did not call Mr. Bowman or any other expert as a rebuttal witness on the points made, but satisfied himself with cross-examination on these points.

A different and important area of examination drew upon some of Mr. Shaneyfelt's other skills as an examiner of questioned documents. Some of the exhibits in evidence were examined and compared to determine what characteristics had been imparted in their processing by copier machines. Also, he examined them under ultraviolet light to discern what their relationship might be as compared with that which was represented by the witnesses and other documents.

In comparing the second page of Exhibit 151 with Exhibit G (a document from Summa files) he came to the conclusion that Exhibit G had its origin in the original document. This was based on a black dot paper imperfection which the copier machine reproduced. Also, he noted similar typing characteristics, for example, the lines under the "pp's" in the word "appropriate" in the last line. Further, in superimposing Exhibit 151 over Exhibit G the edge of the paper exactly coincides with the diagonal line along the right border, so that the placing of the typing on the page matches the edge as it appears on the original. Exhibit C 337 (like the signature page on Exhibit 151) he found to be similar. Hence, Exhibits 151, C 331 and C 337 are all related.

He then made the same comparison with Exhibits 152 and C 331, which are copies of each other.

Mr. Shaneyfelt went on to say that on Exhibit C 331 there are other markings on it indicating it has been on a different machine. The markings on Exhibits C 331 and C 337, and not on Exhibit G, show that Exhibit C 331 was made from C 337.

The additional markings on Exhibit C 331 show that the copier machine used to prepare Exhibit C 331 was different than that used to prepare Exhibit C 337. In other words, a copy was made of Exhibit C 337 and then that copy was used and copied on another machine to make Exhibit C 331. He pointed out the faint angle form made by dots under the word "expire" and the form of a boot at the top made by dots. It was his opinion this showed Exhibit C 337 was copied and that copy executed "No good cannot use, Levar" and then put on another machine to make Exhibit C 331. Exhibit 152 was made from Exhibit C 331, or a copy of it. (Tr. p. 152 of direct examination.)

From his examination he concluded that Exhibits C 324 through 329 were not made

at the same time and on the same machine as Exhibit C 331. His opinion was buttressed by the fact he found sixteen little characteristics found on Exhibit C 331 that came from the copier that was used to prepare it and none of these appear on Exhibits C 337 or 324 through 329. This shows that Exhibit C 331 went through an additional copying process that none of the others went through.

Mr. Shaneyfelt made a layover that reflected these sixteen characteristics in the random pattern they showed and testified this same pattern (Exhibit 9) of these characteristics could be found on Exhibit UU, which bears the courier's mark of 825 and is also known by Exhibit 825. This is the document that was attached to Mr. Wyshak's motion as Exhibit B and purports to be a request dated June 21, 1974, from Mr. Hughes, in effect to let Meier have the money he received. Exhibit C 331 was Exhibit A to the motion as hereinabove described. (Tr. p. 162 of direct examination.)

He testified he also put the "layover pattern," Exhibit 9, with the sixteen identifying characteristics over Exhibit 10, which carries the courier's code number of 2688, dated June, 1975, and found the characteristics were on Exhibit 10 and conformed to the Exhibit 9 pattern. (Tr. p. 164 of direct examination.)

The examination was then directed to a comparison of the paper used in the exhibits under consideration. Specifically he compared the paper in Exhibits C 331 (152), UU (825), 18 (2688) (Exhibit 10 is a many-generations-later copy of Exhibit 18) (Tr. p. 170 of direct examination) with the other exhibits, C 324 through 329, by examination under ultraviolet light. Because of chemicals used in the sizing of the paper and the various coatings put on, the papers will fluoresce brightly. Other papers, without brighteners, may look dark. Hence, ultraviolet light can be used as an aid in establishing dissimilarity of papers.

The comparison of Exhibit C 331 with Exhibits C 324 through 329 under ultraviolet light showed that Exhibit C 331 was a different paper. It looks very dark under ultraviolet, while Exhibits C 324 through 329 were brighter in color. This established that C 331 was of a different paper as well as having the additional copier machine markings described above. He found the same to be true with Exhibit 825, which is attached to UU, with Exhibit 10 (18), number 2688 and with Exhibit C 330. This exhibit is similar to the first page of Exhibit 151, except that in Exhibit 151 in the third line from the bottom a "t" has been added to the beginning of the word "herein" which does not appear in Exhibit C 330. (Tr. pp. 177, 178, and 179 of direct examination.) The carrier markings are not on Exhibits 324 through 329 and other documents on either side of Exhibit 18. Also, Exhibits C 332 through 336 do not contain the copier markings and paper characteristics as found in Exhibits C 331, 825 (UU), 18 (2688), and C 330. Exhibits C 324, 325, 326, and 327 are pages of an order this court signed July 26, 1973. Exhibits C 332 and 333 are second page documents of Exhibit 151. Exhibit C 334 and 335 are first and second pages of Exhibit 151. Exhibit C 336 is like the first page of 151, except that it doesn't have the small "t" in front of "herein" in the third line from the bottom, as does 151.

Mr. Shaneyfelt examined with the naked eye 2680, 1, 2, 3, 5, 6, 7, 8, 9 and 2690. He noted that 2688 (Exhibit 18) was different than the others, whiter. Under ultraviolet light he pointed out 2688 (Exhibit 18) and UU (825) were dark ones, as were Exhibits C 331 and C 330. (Tr. pp. 185, 186 of direct examination.) And again, the paper on these four was different than any of the others in Exhibits C 324 through 336.

Mr. Shaneyfelt also examined Exhibit J, which was identified as being evidence Ms. Trevillion got from Mexican authorities. They were numbered 2680 through 2690, except 2684. They were received as Exhibits 11 through 20. He found no documents with the carrier markings referred to.

Cross-examination of Mr. Shaneyfelt by Mr. Wyshak brought out other information concerning the Exhibits C 324 through 337 (except 331) which, it is remembered, were

purportedly the numbered and coded pages by the courier, Ms. Trevillion. It was stipulated that Exhibit 152 was a third or fourth generation copy of Exhibit C 331. Also, Exhibits E and F and Exhibits C 329 and 334 have the small "t" above referred to. Mr. Shaneyfelt acknowledged that in Exhibits C 329 and 334 there were characteristics about these exhibits that would tend to indicate they were not made at the same time. In this respect he pointed to a dark area on Exhibit C 329 which is light on Exhibit C 334. Besides, there is a little dark edge along the bottom of Exhibit C 334, on the lower left-hand edge, not on 329. These would be indicative of the fact that they were probably not made on the same machine at the same time. Normally, he said, this results when a document is put on a machine and two or three copies are made of it. They tend to have the same alignment, arrangement on the paper and all the same characteristics. (Tr. pp. 143, 144 of cross-examination.) But comparing 329 with 334, he did not believe 329 was copied from 334. It was his further opinion that Exhibits C 333 and 335 (similar to the second page of 151) were not made on the same copier at the same time. Again, he observed, there was a black edge on the left-hand border of 333 and none on Exhibit C 335.

When questioned about 332 he said he thought it was a different paper than 335. There was also a size difference in that in Exhibit C 332. A typewritten line is shorter than in 335 or 333 (second line of second page of the affidavit). (Tr. pp. 148, 149 of cross-examination.) This is due to the fact that various copier machines either enlarge or reduce slightly. From examination he said that 333 may have been made from 332, or a copy thereof, and the copier characteristics appear to have carried over to 333. (Tr. pp. 149, 150 of cross-examination.) He further affirmed that Exhibit C 331 was made from 337 (unsigned copy) or a sister copy in the Mexican records and that 331 was later written upon and signed. (Tr. pp. 151, 152 of cross-examination.) Thus, plaintiff argues, C 331 was a copy made from 337, which was among the Mexican records,

but neither was written upon and signed at that time, and then subsequently C 331 was written upon and signed by some unknown party, not Mylar. Hence, it could not be a copy of an original record had in Mexico on September 20, when the records were sent to New York. Therefore, no copy of said originals held by the Mexican authorities and examined and copied by Ms. Trevillion on October 20 could have contained such a document, so written upon and signed. Hence, C 331, it is said, cannot be a true copy of the Mexican records, but is the result of forgery, which both experts agree it is, at a later time. The plaintiff also contends that the testimony of Mr. Shaneyfelt of the likelihood of the forgery of Exhibit 825 (UU), the forgery of C 331 (152), and the identifying copier markings of Exhibit C 330 and Exhibit 18 (Exhibit 10 is a later copy) and of Exhibit 825 (UU) and C 331 (152) show all of them to be spurious as documents not found among the original Mexican records sent to New York, or the copies allegedly made by the Mexican authorities and copied by Ms. Trevillion and taken to Canada.

Upon further cross, Mr. Wyshak elicited from the witness the fact that he had not examined all the files received by Davis & Cox (plaintiff's attorneys) from the Mexican authorities.

On redirect examination by Mr. Clyde it was brought out by Mr. Shaneyfelt that some of the documents here discussed showed distortion in the typing in a particular area. He thought it most likely this was caused by a flaw in the glass, or more likely grease on the glass. He identified Exhibit C 330 as having this unusual copier characteristic. It was noticeable in the typing along the lower right-hand portion of the page. The paper is bulged up by the grease and causes an uneven diffusion of light, so the camera lens does not pick up a sharp reproduction. (Tr. p. 204 of redirect examination.) As a point of comparison the witness noted that Exhibit C 329 did not have the distortion or the copier characteristic. This appears to be significant evidence in support of the argument plaintiff has made

that Exhibits C 330 and 329 were not made at the same time on the same machine. (Tr. p. 206 of redirect examination.)

Mr. Shaneyfelt then similarly identified distortion on Exhibit UU (825), on both copies of the same document, noticeable in the word "Greenspun" on 825, and on "Meier" in UU. He also recognized the same distortion on Exhibit 18 (2688) in the word "Holmes," and the word "Texas." (Tr. p. 209 of redirect examination.)

The witness made a comparison with Exhibit 15 (2685) (not the same in content as Exhibit 18) and concluded there was no distortion, nor on Exhibit 11 (2680). As to Exhibit C 331 (152) he said there was no distortion that would be observable because there was no typing in that area. (Tr. p. 212 of redirect examination.)

Next he stated that Exhibits 10 and 331 had the same machine characteristics.

The foregoing represents the significant testimony on direct and cross of the two experts, Mr. Bowman and Mr. Shaneyfelt, with some few observations of the court. The court placed them together to enable an easier comparison.

Mr. Wyshak also called Terri Clements Trevillion, the person described as the courier. She testified that through the intervention in her behalf of the Hon. John Reynolds, Canadian member of Parliament, she was able, with the assistance of the Mexican authorities, to obtain papers and the use of a machine to make copies of their purported copies of the Hughes records obtained by the authorities at the time of his death. She described how she made the copies and put a number on the back with an ultraviolet light stamp. There were some two to four thousand documents. She identified Exhibit C 331 (with the number 331 on the back) as one of the copies she could have made (same as Exhibit 152), but that she did get some copies from the Mexican authorities where they had extras in the group given her to copy. Also, they gave her documents covering the last eight months of 1975. She acknowledged she could not say what the content was of Exhibit C 331 (152). She additionally identi-

fied Exhibits C 334 through 337 and Exhibit UU (0825), but that she only examined about 36 of 4,000. She said Mr. Meier put the date January, 1974 in the upper right corner of Exhibit C 331 (152). She testified there were many other documents, some of which were received in evidence, that she gave to Mr. Reynolds on October 21, 1974, when she returned to Canada. Subsequently he gave them to Mr. Meier. There is no testimony in the record as to the custody and possession of the Mexican copies from the time they were taken into possession by the Mexican authorities until she made her copies, except for the delivery of originals to Davis & Cox in New York on September 20. The foundational basis for their accuracy and genuineness as offered is thus subject to this infirmity in the chain of evidence.

On cross-examination she acknowledged she had been introduced to Mr. Reynolds by Mr. Meier, whom she had seen frequently, and with whom she had a phone conversation while she was in Mexico. Unfortunately she stated that she had lost the ultraviolet stamp used to number the exhibits. This made comparison impossible with the number "0825" on that exhibit (UU-825) which she acknowledged appeared larger than the other numbers, but which she said may have been caused by the speed with which she was putting the stamp on, tending to enlarge it.

Mr. Wyshak called Mel E. Stewart, who had been employed by Hughes as his barber, to testify of his observations of Mr. Hughes' disintegrating condition, his use of drugs, his broken hip in 1973 and the debilitating effect it had, and his observation of those who were aids. It appeared he was called primarily to testify that Richard Anderson, the notary on Exhibit 2, never saw Howard Hughes, to his knowledge. He did state that he saw Howard Hughes fingerprinted on one occasion, but refuse on another, lending at least some credence to the fact that having Howard Hughes' fingerprints on Exhibit 1 was not out of character on occasion. His testimony did show Mr. Anderson as typing and being in an office

outside where Mr. Hughes was. Further, he noted there were papers and documents in Howard Hughes' room and that he did not know whether Holmes ever took Richard Anderson in to see Mr. Hughes.

Gordon Margulis, a waiter and bodyguard for Howard Hughes, also testified, describing some of the same conditions as Mr. Stewart, and Mr. Hughes' greater dependency after he broke his hip, not walking thereafter. He also observed Richard M. Anderson typing at times, even moved the typewriter for him at times. He said that in his observation he had never seen Richard Anderson in with Howard Hughes, and that Mr. Hughes would procrastinate and was reluctant to sign things. In fact, he never saw him sign anything, or have his fingerprints taken. He testified that on occasion he helped Stewart dress and prepare him for visits with important people. He remembered that when Howard Hughes was at Freeport he had been visited by Richard Anderson.

Mr. Wyshak recalled Mel Stewart. In the course of his testimony it developed that on occasion he saw Mr. Hughes visited by his attorneys, by the Governor of Nevada and others; he saw Mylar in a meeting with them. This was in 1972 or 1973. He also knew that business was accomplished and papers taken in to be signed, although he didn't see him sign. He remembered preparing him for the visit of distinguished guests and for several plane trips. He then named a number of people who visited Mr. Hughes at times, including Mr. Davis and Richard M. Anderson at Freeport. He was frequently asked to sign documents. He wasn't there when Mylar or Richard Anderson asked him to sign anything, although his aides took documents in from time to time.

The last witness Mr. Wyshak called was Robert Robertson, a self-styled writer and journalist who said he knew and was with Meier on November 4, 1976, on a visit to Mr. Reynolds' office, the member of the Canadian Parliament. He observed Mr. Meier come out with a box of files. He states he examined them and remembered

eighteen or twenty documents. Among them he says he saw Exhibits C 331, 825, E, F, G, 15 through 18, but not D. He testified he drove him to the airport where Meier sent some of them to his lawyer. Since November 4 he has not seen any of them.

The foregoing represents what appears to be the significant testimony of the witnesses for the defendant in this fraud hearing, with some of the court's observations in connection therewith.

The plaintiff, in addition to Mr. Shaneyfelt, called Christine Trump, a secretary who works in the office of Chester Davis, plaintiff's chief counsel. She testified that on September 20, 1976, she received the shipment of documents from Mexico, consisting of thousands of items. She described the "lock and key" security the office force used to protect the integrity of the records. In addition, a checkout system was adopted to assure the return of documents that were removed. She did not see a copy or the original of Exhibits 152 (331), UU (825), or Exhibit 10 (2688) in her examination of the records. She did see copies like 151 and 152 that were not signed and/or written upon. The private secretary of Mr. Davis had responsibility with her for the records.

With the addition of Christine Trump, the foregoing represents the significant testimony of the witnesses for the plaintiff on the issue of fraud.

## POSITIONS OF THE PARTIES AND THE COURT'S FINDINGS THEREON

By way of argument upon these basic facts, Mr. Wyshak emphasized primarily that the court was solely concerned with whether or not the affidavits in question, Exhibits 153 and 151, were forgeries and thus a fraud upon the court. It was defendant's expectation that if he were able to prove his claim that the court should order further appropriate proceedings in the case in chief. He primarily relied upon Mr. Bowman's testimony, pointing out the dissimilarities between the Maheu exemp-

lars and the affidavits in the letters making up the word "Howard." He strongly argued that Exhibits 153 and 151, filed in the case in chief, and purportedly signed by Howard Hughes and notarized by Levar Mylar, and Exhibit 1 and Exhibit 2 (plaintiff's exemplars), were signed by a different person than wrote the text and signed the name "Howard" in the Maheu exemplars. In contrast, he asserts, the defendant's exemplars (Maheu exemplars), were fully established by Mr. Robert Maheu in his deposition in which he identified deposition exhibits herein referred to as Mr. Hughes' writing.

Mr. Clyde's major points of emphasis urged upon the court the view that plaintiff's exemplars, Exhibits 1 and 2, had been established by the clear weight of the evidence as having been executed by Mr. Hughes. He pointed to the testimony of Mr. Shaneyfelt that Exhibits 153 and 151 compared favorably with the exemplars he used, Exhibits 1 and 2, and that the signatures of Howard R. Hughes on Exhibits 153 and 151 were signed by the same person who signed Exhibits 1 and 2. He supported this thesis with Mr. Shaneyfelt's testimony that, making allowance for time and health limitations, the signatures on Exhibits 153 and 151 were compatible with the same person having written them and the text and signatures on the Maheu exemplars.

He argued the limitation of the testimony of Mr. Bowman, in dealing only with the word "Howard," while Mr. Shaneyfelt examined with respect to the full name, Howard R. Hughes. In addition, through Mr. Shaneyfelt, Mr. Clyde attacked the credibility of some of Meier's exhibits, 152 (331), UU (825), 330 and 18 (2688). Shaneyfelt gave his opinion that in comparing them with other exhibits with which they were allegedly found in Mexico that examination by ultraviolet light and for copier machine characteristics, as well as the writing characteristics showed they were questionable.

He emphasized Meier's burden was to show by clear and convincing evidence Exhibits 153 and 151 were forgeries in order to establish fraud on the court. He urged strongly upon the court that in addition to the other arguments made that to find fraud upon the court the sworn testimony of Levar Mylar and Richard M. Anderson would have to be wholly discounted as perjured, which he felt had not been established or even successfully brought into question.

The court has carefully listened to the sworn testimony of the witnesses, the arguments of counsel, and examined again and again the many exhibits, comparing them and reviewing the testimony of the witnesses, and is prepared to make its findings of fact and conclusions of law, with an order based thereon.

The two experts in the case were men of substantial training and experience, with Mr. Shaneyfelt having had a longer, broader and more intensive experience as a result of his many years with the FBI. His expertise in ultraviolet light examination and copier machine characteristics left on paper gave him a three-pronged approach to the peculiar problems in this case. His conclusions had broader evidentiary support, but were not without their weak spots, which Mr. Wyshak effectively brought out. Their difficulties in reaching compelling conclusions dramatically show why the profession of handwriting analysis is far from an exact science in resolving precisely problems such as are present here.

However, beginning with what they substantially agree, the court finds that Exhibit A (Trial Exhibit 152 [331]) attached to Mr. Wyshak's motion, showing a second page like that of Exhibit 151 but with the words written on it, "No good—cannot use. Levar," is a false or forged document. The notary who verified the genuineness of Howard R. Hughes' signature on both Exhibits 153 and 151 was Levar Mylar and an aide to Mr. Hughes. It was his first name that appeared on Exhibit 152 (331). He testified categorically that he did not write on or sign his name on 152. With this overwhelming evidence there is clear and convincing proof of the falsity of this instrument.

Exhibit 151 purports to be signed by Howard R. Hughes and notarized by Levar Mylar. Exhibit 153 is similarly signed and notarized, differing only in that it purports to be a phone verification as a basis for notarization.

Levar Mylar, whose testimony of the forgery of 152 was conclusively supported by the experts, unequivocally said that he notarized those documents (153 and 151) as indicated on the documents, one by phone and the other in person. This statement was also supported by the experts. Again, his testimony is without substantial dispute, except for the expert testimony of Mr. Bowman. Bowman's opinion was that while the same person probably signed each and may have signed plaintiff's exemplars Exhibits 1 and 2, it was not the same person who signed the Maheu exemplars. These exhibits were so called because the foundation for their being exemplars of Mr. Hughes' writing was provided by Robert Maheu, at one time one of his aides.

Mr. Bowman's testimony, examining and comparing the various letters and words, was very effective and required careful consideration. Particularly the attack on Exhibit 1 was persuasive and thought provoking. The experts spent a substantial part of their testimony in this controversy and comparing the signatures of Howard R. Hughes on Exhibits 153, 151, 1 and 2, cumulated on 6, with those on the Maheu exemplars. Mr. Bowman's testimony was disputed by Mr. Shaneyfelt who said that the same person wrote Exhibits 153, 151, 1 and 2, and that the claimed differences on Exhibit 1 could be accounted for over time, and making allowances for changing age, health, and position while signing. Further, the signatures on Exhibit 1 were substantially comparable, as shown on Exhibit 6, with those on Exhibits 153, 151, and 2. On his examination of the writings he concluded the same person made them all. The Maheu exemplars were written in 1968 as compared with 1972 and 1974 for Exhibits 1 and 2. And the testimony showed deteriorating health over this period, with a broken hip in 1973, providing the factual base for changes Shaneyfelt thought might occur

over time. Supporting the signatures of Howard Hughes on Exhibit 1 were his fingerprints thereon, and undisputed. Besides that Levar Mylar testified he watched the execution of Exhibit 1 by Howard Hughes.

The writing differences caused the court to spend many hours in examination. Bowman and Shaneyfelt were both responsible witnesses. But the testimony of Mr. Shaneyfelt must be accorded greater weight in the dispute over exemplar comparisons with questioned documents on his greater experience and more extensive analysis. Mr. Bowman only examined for the word "Howard." Mr. Shaneyfelt examined for the whole name "Howard R. Hughes." Mr. Shaneyfelt's expert opinion is supported by the fingerprints on Exhibit 1 and the positive testimony of Levar Mylar that he witnessed it. Certainly the preponderance lies here.

Similar factors bear upon the execution of Exhibit 2. The original of this document, it will be remembered, was filed in the Superior Court for San Francisco, and represented "Answers to First Set of Interrogatories to Howard R. Hughes." It shows execution by Mr. Hughes, and notarization by Richard M. Anderson. There is nothing in the evidence or in the information in the document to indicate what possible reason Mr. Hughes would have for having this document forged. The similarities between this exhibit and Exhibits 153, 151 and 1 formed a sufficient factual predicate to justify Mr. Shaneyfelt's opinion, and for Mr. Bowman's to the effect the same person made Exhibits 153, 151, and possibly 1 and 2. With the further buttress of Mr. Richard M. Anderson's testimony that he witnessed the signing of Exhibit 2 by Mr. Hughes, certainly the substantial evidence is that Mr. Hughes signed Exhibit 2.

Mr. Wyshak's cross-examination of Mr. Anderson raised the question that his employment may well have induced him to perjure, upon threat of loss of his job, similar to Mylar. Mylar was corroborated by handwriting testimony. On Mr. Anderson's it was speculation and not proof he was

falsely swearing. The attack failed. The court cannot find by clear and convincing testimony he lied. The preponderance supports him. The logical reach of the handwriting testimony to conclude that Mr. Hughes wrote the Maheu exemplars and Exhibits 153, 151, 1 and 2 is the most difficult question. However, considering all of the evidence received, and carefully weighing the expert testimony, the preponderance is with the opinions of Mr. Shaneyfelt.

Mr. Wyshak introduced other exhibits, seeking to cast doubt on the credibility of plaintiff's exhibits and witnesses. One of these was Exhibit UU (825), purportedly signed by Howard Hughes, dated June 21, 1974, but without advice as to whom it was supposed to be directed. It represented Meier was entitled to the money he received because Howard R. Hughes had agreed to it. This was acknowledged by Mylar and Shaneyfelt as appearing like Howard Hughes' signature. Visual examination shows similarity. Mr. Shaneyfelt was of the opinion that the word "Howard" in 825 was strikingly similar to 331. Since he had determined 331 was a forgery his inclination was that 825 was forged.

Strengthening this view was his testimony that ultraviolet light examination and study to detect copier machine characteristics showed that this document, Exhibit UU (825), along with Exhibits 152 (C 331), C 330 and Exhibit 18 (2688), were not copied at the time Ms. Trevillion copied the other documents that have been compared with them, herein, Exhibits 324 to 337 and others. And that in particular it meant that the writing on 152 (C 331) was done after it was first copied from the original from among the Mexican records, which was not signed. Rebutting this conclusion defendant pointed out Ms. Trevillion said some exhibits she received were given her without being copied. Also, testimony showed unexplained characteristics and typing anomalies in the exhibits relied upon. The significance of these has not been adequately explained. These include the small "t" in front of "herein" on 151 and other exhibits, and other typing irregularities. What the result of the examination might reveal is only speculative.

The testimony of Mr. Robertson buttressed the chain of evidence for the defendant. Mr. Robertson was of good appearance and testified forthrightly about having seen and examined some of the records in question on November 4, 1974, as previously described herein. His testimony of having seen Exhibits E, F, G, 15 through 18, C 331 (152) and Exhibit 825 was not disputed, except to show he had some friendship or acquaintance with Mr. Meier. But he was with him a relatively short time. The important point was that he testified he was with him November 4, 1974, when he picked up the records from Reynolds until some of them were mailed to Mr. Wyshak.

A fair construction of the intent of the defendant in offering his disputed exhibits, Exhibits 152 (C 331), UU (825), C 330 and 18, is that they were intended as documentary evidence from the plaintiff's own original records, by way of the Trevillion copies of the Mexican copies. As such they would tend to rebut the claim of plaintiff of the genuineness of Exhibits 153 and 151.

Mr. Wyshak advised the court there was need to use an expert to explore the possibility of forgery of Exhibits 153 and 151. It was understood he hoped that with this professional assistance he could establish his exhibits as having authenticity as copies coming from Mr. Hughes' records. He also asked for broader discovery privileges than the court was willing to grant to more widely explore the execution of documents generally by Mr. Hughes or his aides, claiming this would be material to whether Exhibits 153 and 151 were executed by Hughes. The plaintiff objected to thus widening the scope to other matters, some of which were already in controversy in other courts. The court allowed many comparisons, but sustained the objections as to the broader scope sought, ruling that the purpose of the present inquiry did not justify the prospect of expanding the scope of inquiry to these other transactions.

In his cross-examination of Mr. Shaneyfelt about his ultraviolet light examination

of the disputed documents, Exhibits 152 (C 331), UU (825), C 330, and 18, of the defendant in comparison with others (they were much darker) that were admittedly copies of some of those in plaintiff's files, Mr. Wyshak asked Mr. Shaneyfelt to similarly examine some of the documents in Exhibit J. He fanned them out before him, starting with 29, 35 and going down progressively. Mr. Shaneyfelt acknowledged that "every other one, sometimes two dark ones together, but they alternate, light and dark shade." (Tr. p. 111 of cross-examination of Shaneyfelt.) He conceded this did not mean that they were made at different times on different copiers. He attributed it to different paper and different coatings on the paper. The same he had found to be true in examining a "batch of xerox paper out of the package," light, dark, etc. (Tr. p. 112 of cross-examination of Shaneyfelt.) He thought the alternating pattern might be the result of the way it was manufactured. He compared some of these with the above noted disputed documents and thought the color on the latter ones was much darker, but found some that were even darker than the disputed ones.

To the eye of the court, upon observing the demonstration above described, it made the opinion he had previously given about the questioned exhibits, in this regard, at least, less conclusive and appear to require some speculation as to the degree to which the information provided would enable the court to precisely draw the conclusions plaintiff was expecting.

Mr. Shaneyfelt's testimony identifying certain documents as having been made subsequent to the Trevillion copies and then executed, 152 (C 331), was also subject to limitation. Certain typing characteristics, as, for example, the "t" before the word "herein" on Exhibit 151 and others, were not in the court's memory accommodated to plaintiff's theory. Also, Ms. Trevillion said certain copies of the copies made by the Mexican authorities were given her—so that there is no way to conclusively tell, if this be true, which of the documents in evidence have machine characteristics from this source. The court believes, however,

this fact would have only limited impact on Exhibit 152 (C 331)'s falsity, in view of the overwhelming evidence on this aspect.

It was argued that the infirmities of the chain of evidence affecting the probative value of the disputed exhibits were not as critical as had been stated. From the plaintiff's side of the case the testimony of Christine Trump described the receipt of the Mexican records at the law offices of Davis & Cox, plaintiff's attorneys, and the "lock and security system" used to protect the records. Nonetheless, there was participation in that system by another secretary, with whose activities she was not fully familiar. She did not testify. Further, Mr. Jaffe, one of the lawyers of the firm, was identified as having access. By reason of the location of the records Mr. Davis, and perhaps other firm members, may have had access. It would not be possible under such circumstances to logically exclude any chance of access by others to the records. In this regard it is to be remembered that the manner of Christine Trump's examination of the records was not an item-by-item listing that would enable her to state categorically that there were no such records received by Davis & Cox from Mexico.

On the other hand, we did not have the testimony of Mr. Reynolds to tell us when and from whom he received the exhibits, what their appearance was in the critical aspects under attack in this case, when he delivered them to Mr. Meier, and what involvement and opportunity to observe Mr. Robertson had.

Mr. Clyde, apparently, as he reported to the court, served Mr. Reynolds in San Francisco, for the purpose of taking his deposition. He reported that Mr. Reynolds went back to Canada without being deposed, supposedly contrary to plaintiff's wishes. (Tr. p. 51 of Ms. Trevillion.)

Further, we do not know whether Mr. Meier had access to the records from October 21 when Ms. Trevillion is supposed to have delivered them to Mr. Reynolds' office, to November 4, when Mr. Robertson said he looked at them with Meier. Mr. Meier's

interest is evident in assisting Mr. Reynolds to get the help of Ms. Trevillion (Tr. p. 65 of Ms. Trevillion) with whom he had some acquaintance, in her going to Mexico, making contact with her while she was there (though she said it was on another matter), and eventually in receiving the records and sending some of them to his attorney in court. We do not know what he saw and did with respect to the records on the critical points discussed; what the appearance of the documents was; what writings were thereon; his knowledge about the execution of Exhibits 153, 151, 1, 2, 152 (C 331), UU (825), Exhibit C 330, Exhibit 18 (2688) and others; and as far as he knows where and when and under what circumstances the documents here were xeroxed and signed and copied.

His right to claim the Fifth Amendment is not questioned. But claiming the Fifth Amendment does not preclude an inference being drawn that the testimony of a person who could have been called, but was not, may have been adverse to his claim. Mr. Reynolds' testimony, whether by personal appearance or deposition, would reasonably be expected to help resolve the issues here. And yet he was not called, nor his deposition proffered. It would have covered an important time segment in the chain of evidence.

Because of the wrangling and controversy surrounding another subject, which may involve inferences, the court believes the record should be set out to clarify the situation somewhat.

On November 30, 1976, the court entered its written order calling for the evidentiary hearing on the issue of whether there had been a fraud on the court. In paragraph 5 the court said that since Exhibits A and B attached to Mr. Wyshak's motion (Exhibits 152 (C 331) and UU (825) at the hearing) were photo copies, that Meier was ordered to provide forthwith the best copies he had of them, originals if possible, and specifically including the documents from which A and B were copies. This was to assist counsel and their experts in examining the documents in issue. Paragraph 6 of the order

required information on the location of the originals to be given to the fullest extent possible.

At the hearing on January 5, 1977, during the recross-examination of Mr. Bowman, he was answering questions on the deposition Exhibits A through G. Mr. Clyde made a demand for all of the originals of these exhibits, A through G. (Tr. p. 109 of re-cross-examination of Bowman.) A few minutes later, as counsel and the court were discussing when to terminate for the day, Mr. Clyde said:

I think we're not likely to finish. If we do, I would still like. to pursue my request that on the exhibits, where I've examined the five numbered documents before and the five after, that the court direct counsel for defendant to produce those also.

The court said:

If others are being brought, I suppose they could be brought along with it. It was just oversight, wasn't it?

Mr. Wyshak said:

Yes, your Honor, with respect to those.

.    .    .    .    .

I merely thought at the time of the next appearance I could bring them. I couldn't possibly get them today or tomorrow.

The court responded:

Of course not. What I had in mind was that when you bring the other documents he's requested, you could also bring these, whenever that reasonable time is.

(Tr. pp. 110, 111 of recross-examination of Bowman.) (It will be noted there is no reference by number to Exhibit UU (825) or any other exhibit in the foregoing colloquy.)

A few minutes later Mr. Bowman was testifying about these same exhibits and said, "I have to have some originals." Mr. Clyde renewed his request for the originals A through G. (Tr. p. 113 of recross-examination of Bowman.)

On the next day, January 6, 1977, Mr. Shaneyfelt was being cross-examined by Mr. Wyshak about Exhibit G. Mr. Clyde asked Mr. Wyshak for the originals of the

deposition exhibits, A through G, and the "consecutive number documents, around 825," he was supposed to bring. Mr. Wyshak produced C, D and E of the originals of deposition exhibits, but stated he didn't have the 825 series. When asked for a reason he first said:

> No specific reason, I just took the request for production to be when Ms. Trevillion testifies. I just never asked for them.

(Tr. p. 192 of cross-examination of Shaneyfelt.)

Mr. Clyde reviewed for the court what he recalled of Mr. Wyshak's being asked to bring the documents, five before and five after (Exhibit 825). However, he overlooked the fact he had failed previously to identify Exhibit 825. This gave credence to Mr. Wyshak's response:

> I don't have any recollection about that 825 business. Otherwise I would have brought it. I do recall the conversation relating to those originals, and I think I have them here.

And further:

> No, I did not request them, your Honor. I had no recollection of what Mr. Clyde now represents we were asked, because we were rushing to catch a plane. I overlooked it.

(Tr. pp. 190, 191, 192, 193 of cross-examination of Shaneyfelt.) Mr. Wyshak further responded that he was aware of the requirements of paragraph 5 of the November 30 order of the court and that the exhibits he offered were the best he had available. (Tr. p. 196 of cross-examination of Shaneyfelt.)

The court then required of him that his client file an affidavit advising whether he had any knowledge of any prior original to 825. He agreed so to do. (Tr. p. 198 of cross-examination of Shaneyfelt.) On February 2 the court received his affidavit stating he had no better copy and knew of no other original.

The record shows the real possibility of misunderstanding on Mr. Wyshak's part, insofar as the in-hearing conferences were concerned. Nonetheless, Mr. Wyshak's response should have been sharpened by the strong language of the court's order of November 30. And the final word on it, from Mr. Meier himself, (his affidavit), gives no information on it at all, except that he has no better copy than this one, Exhibit B (825) to his motion. The lack of information, contrary to the letter and spirit of the order of November 30, 1977, the failure to act responsively to the plain intendment of Mr. Clyde's several requests, the fact that no final word was received until after the hearing was over, and then the barest of details, encumbers the credibility of defendant's claims of cooperation and adversely affects the weight defendant asks the court to give to its claims for Exhibit 825.

## SUMMARY OF FINDINGS

By way of findings based upon the court's determinations hereinabove set out, the court concludes as follows:

█ 1. That Exhibit 152 (C 331), by clear and convincing evidence, based on tell-tale distortion anomalies and copier machine characteristics left thereon, by ultraviolet light examination, and by handwriting analysis, is a forged instrument; that a preponderance of the evidence shows that in significant aspects the exhibit was subject to serious question as to its validity. The court believes with reasonable effort defendant could have assisted the court with better support for the chain of evidence for this exhibit. Paragraph 6 of the court's order of November 30 required a best effort, which the court feels was not given. Notwithstanding, in view of all of the evidence the court has received, and carefully weighed, it cannot, at this point, find that clear and convincing evidence shows that defendant's acquisition and use of this exhibit was through connivance and fraud, for the purpose of deceiving the court.

█ 2. That while at this point a preponderance of the evidence seems to indicate that under all the circumstances adduced herein Exhibits 825, 330, and 18 are closely related in their reproduction and execution with Exhibit 152 (C 331), the

court cannot say that clear and convincing evidence establishes their forgery and the responsibility of the defendant for the same in a fraudulent purpose to deceive the court.

■ 3. The defendant has failed to show by clear and convincing evidence that someone other than Howard R. Hughes signed Exhibits 153 and 151 and that their filing with the court therefore constituted a fraud on the court.

### CONCLUSIONS OF LAW

1. As a result of the court's findings above set out, the court concludes that Exhibits 153 and 151 stand as affidavits signed by Howard R. Hughes, and properly on file in this case.

2. Having so found, the court should proceed to a conclusion of the case in chief.

### ORDER

Based on the foregoing findings of fact and conclusions of law, the court concludes the hearing on the issue of fraud on the court under the facts presented herein, and will proceed to a decision in the case in chief.

See also D.C., 489 F.Supp. 333.